17-2497.   You reserve the floor. Thank you. We have a busy morning this morning. We have five cases that we're considering. Four cases are set for oral argument here and one case has been submitted on the briefs. So let's get started with the first case, General Electric Company v. United Technologies Corp. 17-2497. Mr. Ferguson. Thank you, your honor. You reserve six minutes of your time and your 15 minutes for the vote, correct? That's correct, your honor. Okay, you may proceed. Thank you. Good morning and may it please the court. The board committed legal error in its obviousness analysis of claims 7-11 of the 605 patent. Can you start with the jurisdictional question, which I at least personally find to be quite serious? Yes, your honor. So the issue in this case is whether GE has standing to have its appeal heard and in particular whether GE has shown an injury in fact. Now while we agree that in many of this court's decisions regarding standing in the IPR context, the focus has been on the likelihood that the petitioner would face a patent infringement lawsuit. But it is also clear under both this court's precedent and the Supreme Court precedent that the specter of a lawsuit is not the only form of injury sufficient for standing. Economic injuries and competitive injuries are also a basis for finding standing. And here, GE has suffered economic and competitive harm due to the existence of the 605 patent in the board's erroneous IPR decision. Is that harm actual or immediate? It is, your honor. GE has already suffered that harm. And the reason for this is because of the very unique nature of the particular market, the particular engine, turbofan engine market that we are dealing with. You have demonstrated dollar loss, is that what you're saying? Correct, your honor. We've demonstrated dollar loss and we've also demonstrated competitive harm. Now on the dollar loss... Where are you determined, I mean, we're relying on your declaration, right, because that's all we have. Correct, your honor. Where in the declaration does it say you demonstrated dollar loss? Mr. Long, GE's declarant, said specifically in paragraphs 15 and 16, for example, that the existence of the 605 patent has caused GE to suffer economic injury in the form of because GE has, in this particular instance, already designed a engine that includes technology like the variable area fan nozzle here that implicates the 605 patent. As a result, because of the very long development periods... Wait a minute, can I just ask you about that too? Did you just say that you have in the works an engine that might infringe this patent? It's not even in the works, your honor, it was already designed. Does this declaration say that specifically somewhere? It does. It does in the paragraphs that discuss the KWXE engine. This is paragraph 14, for example, which includes the picture of the actual KWXE engine that GE previously had developed. As a result of that previous development work, GE actually has this type of technology, this variable area fan nozzle technology in its design toolbox. And when the 605 patent issues... But this was designed in the 70s, right? It was, Your Honor. But still, the point is that this is now an option that GE has when it is determining whether to design a particular engine for a particular customer. I mean, if this was designed in the 70s, how could you possibly risk infringement for this specific design from a later patent? It's not this particular design that would face an infringement lawsuit. It's not this engine. We agree with that, Your Honor. What it is, is it's the result of the fact that GE has this technology. You've led us to this engine with the statement that this is the infringing engine. No, it's not infringing, Your Honor. If I said that, I did not mean to say that. Where's your immediate and actual harm? The immediate and actual harm is caused by its economic injuries. It's caused by the fact that when a patent like the 605 patent issues, GE must take it into account when it is considering its design options for new and future engine designs. You've had this engine on the shelf now since the 70s. Yes. And GE has chosen not to move forward with this engine for all those years, 40, 50 years. But it still is an option that GE has that it can provide to its customers. Now it can no longer do that because of the existence of the 605 patent. I mean, that can't literally be true. You certainly can provide the very thing you created 40 years ago because that can't possibly be an infringement of this patent. Not the exact engine, correct, Your Honor, but we have no guarantee as to how UTC could in the future interpret the 605 patent. It's a variable area fan nozzle that can be used to adjust the pressure ratio of the fan. That's very broad technology. When you say there's a long lead time, can you give me some sense of the lead time? The time involved in designing, making, testing, selling. Are we talking three years? Are we talking 12 years? What are we talking? No. It can take up to a decade, Your Honor, and that is what Mr. Long... Can you get to the last of those points, namely selling to Boeing or somebody? It's literally the process is the aircraft makers will come to the engine designers and say, we are planning to introduce a plane, say, in 2025. We're going to need engines for that plane. That process can begin as early as 2015 or could have began as early as 2015. There is so much research and development cost associated with building these planes, designing them, testing them, then getting them certified. All that has to occur before they can even offer them or sell them to an aircraft maker. Given the claims at issue here, at what point in that process would an activity covered by 271A take place? Not just drawing it, obviously, not doing computer simulations. At what point is there a making, using, selling, importing? It could very well be in the making because GE is a United States company. It would make at least a test engine that would be in the United States that could invoke 271A. So it could be as early as making the first test engine, and that could be somewhere in the middle of that process. One of the... This is switching topics just a little bit, but one of the striking things, I guess, striking to me, things about the paragraph 15 and 16, and then, I guess, was it 22 at the end? Yes. Nothing is said here along the lines of, we have had airframe manufacturers come to us, ask us to consider various designs. We have thought, in the context of a specific potential customer, about a design of a sort that would, I think, what's the word we've used, implicate the patent. This is all, as a general matter, we'd like to keep our options open, and that sounds rather like JTECT, something that we said was insufficient. I believe, Your Honor, it is much more like the biotechnology industries case that this court ruled on. In that case, that's 496F3, 1362. In that case, the District of Columbia enacted a statute or an act that addressed a way to control patented drug prices within the district. That act is actually analogous to the 605 patent. In finding standing in that case, this court said that whether the act is enforced or not, its presence is highly likely to cause pharmaceutical manufacturers to incur costs in an effort to avoid running afoul of its broadly worded provisions. How can that apply here when the engine, you have no engine in development, you don't have an engine on the shelf that's fully engineered that could possibly even infringe? Because it's, as Mr. Long declared, it is necessary that GE incur costs in making sure that it designs around any concern with respect to the 605 patent at all in order to avoid running afoul of the broadly claimed 605. You may decide to do that or you may not. No, Mr. Long has declared that GE has already incurred these types of economic costs as a result of having to design, to ensure that its designs do not run afoul of these broadly worded claims. He says that, but he doesn't, it's hard to link that to the claims at issue here. I mean, I'm honestly pretty sympathetic, but we have language in JTAC that says you have to establish concrete plans for future activity. And I don't see that in your declaration. I mean, maybe that standard is too stringent, but we're bound by JTAC. So how does your declaration show concrete plans for future activity? It seems to me, what one of my colleagues has said, that what you've said is these patents create a potential barrier for us and essentially limit our toolbox. And so even though we don't have specific plans now, that limitation of our toolbox is itself enough damage, but that seems inconsistent with the standard we've required in JTAC. When I read JTAC at your honor, it appears to me that the only allegation that the petitioner made in that case was that there was the likelihood or threat of a patent infringement lawsuit. There are, as the Supreme Court has said, there are other bases for finding standing, such as suffering economic and competitive harm. And that's where we believe in this case, GE has shown through Mr. Long's declaration, which has not been rebutted, that it has incurred research and development costs, expenses. The narrowing of the toolbox, if that's an appropriate analogy, is in itself an injury in fact that causes economic harm. It is a competitive injury, that's correct your honor, and an economic injury, but it's certainly a competitive injury too, because as this court said in Canadian Lumber, competitor standing constitutes an injury in fact when the government acts in a way that increases competition or aids the plaintiff's competitors. And that's the case here. The issuance of a 605 patent. Can I ask you a hypothetical about this? I mean, this is obviously not the facts of your case, but suppose you have a brand new company that's never done aircraft engines before. I know that seems probably completely unrealistic, but bear with me. And they decide before they want to even spend any startup money or anything at all, they're going to go try to clear out pre-existing patents from legacy makers. And they go to the board, which they're entitled to do, they lose and they appeal. Is it enough for them to say, we're suffering economic damage because we want to enter this market and our toolkit is narrowed by these patents? I believe that that would be a fair assessment. A competitor who is entering the market, who is being prudent with respect to making sure that they don't endure, which is GE has said, it costs hundreds of millions of dollars to design these engines. And if you were to ignore a patent, like the 605 patent here, where GE already has that design in its toolkit, if you were to ignore it and introduce that engine and then get sued, it's commercial catastrophe. You will have lost hundreds of millions of dollars because in a market like this where you only have three competitors, the risk is an injunction. Let me change the hypothetical a little bit and say instead of a potential competitor, you have some kind of consumer group that says, there's only two manufacturers out here. That creates monopolistic effects. The government's not doing enough. We think these patents aren't good. And we want to clear away patents and make it easier for others to enter the market. Would that consumer group have standing on appeal? That consumer group itself may not. But the Supreme Court case law is such that in these situations like that, if a specific member of that consumer group is able to show that it has suffered an injury specific to it, then it's possible. But if the consumer group is smart and gets a bunch of like, you know, airline travelers, frequent flyer people, and says, you know, because of this monopoly on engines, the engine prices are too high. I mean, you can go down a string of things, but I just wonder where it stops. I mean, we clearly said in Consumer Watchdog, consumer groups standing alone don't have standing. And I agree with that, Your Honor. And I think- And we took it a little bit further in Phygenics and said, essentially, a non-practicing entity with pretty conclusory assertions didn't have standing. And then we went even further in JTAC. It seems to me that you're either at the JTAC line or we might be pushing it a little bit further still. But I am troubled by that concrete language. Well, I would, I would again say that the difference in all those cases is that what this court looked to was the threat of a lawsuit. That is not the only basis for standing. The other point I want to make before- Mr. Kessler, I'm going to stop you there because we've led you through almost all of your time and you're a lot of 15 minutes. So can you take just a couple of minutes and go through the motivation to combine issue and then I'll give you back some rebuttal time, not the whole time, but some. I appreciate that. Yes. With respect to the merits here, the problem that the board's error was a legal error because what the board did was it required GE to show that the Willis and Duesler combination would have solved the problem of reverse thrust that the 605 patent does not claim, doesn't even describe, and certainly itself does not solve. The claims, when we look at the claims themselves, they are completely agnostic as to any reverse thrust requirement. An engine that practices reverse thrust could infringe those claims and an engine that doesn't practice reverse thrust can infringe those claims. So we need the board error because it did not take into account the scope of the claims when it considered the obviousness of the Duesler-Willis combination. Tell me what's wrong about thinking about it this way. First, that what the claims cover is different, is a different question from what your particular theory of motivation would be. You could have said that somebody not interested in short runway planes would be looking at Willis and taking from Willis a bunch of stuff not dependent on use on a short runway and therefore that person would have been motivated to combine it with a different... V-van. Whatever that is. Yeah, right. That might not in fact have worked so well on short runway engines, but you really didn't say that. That is, your petition and supporting declaration concentrated really pretty much, this is what I want you to respond to, really pretty much only on somebody interested in Willis for the kind of plane Willis was describing and therefore it's simply a failure of proof, not a logical problem. Well, two things, Your Honor. With respect to the merits on the proof, our expert said specifically that there was a It was known that the axially movable sleeve in Dusler was more lightweight, it was simple structurally and in particular, it solved the problem of the radial flaps that were the clamshell flaps that had airflow leakage through them. He said there were some virtues to that. Yes. The question is, did he say, a person of skill in the art would be looking at Willis for a purpose other than a short runway plane? Because if he didn't, and I don't really, not sure he did, there's one parenthetical where maybe he did, the parenthetical referring to military planes, but I don't know how long their runways are, that he pretty much concentrated on, I'm looking at Willis for the purposes Willis designed its engine for, and then there's an offsetting, there are benefits, there are deficits, and the board, it seemed to me at that point, had a basis for saying, you didn't show that a skilled artisan would have a motivation to choose those benefits at the risk of incurring the deficits. I believe that our expert looked at the Willis engine in the context of what the scope of the asserted claims here, the 605 patent claims were. The 605 claims are, again, completely agnostic as to short-haul engines, as to the lengths of the runway. They don't need to be commercial, it doesn't need to be a commercial engine at all. So what our expert focused on was correct. He focused on the actual scope of the claims. And what the board came back with was an analysis that, well, maybe this combination, this combination wouldn't work as well to land on a runway of 2,000 feet, et cetera. But that is contrary to what this court has said in, for example, In re Mutet, where this court says specifically, when we look at the issue of principal operation, it has to be vis-a-vis the actual claim that is at issue, and in Mutet, what the court found was that the combination would still be operable vis-a-vis the broad scope of the claim that was the subject of the rejection. And I think that's the exact case here. Okay. I think we have your argument on that. Thank you, Your Honor. I appreciate the extra time. Thank you. Dr. Beledick. Good morning, Your Honors. My name is Mike Belick for United Technologies Corporation. As we transition from the Article I proceeding in front of the Patent Office to this Article III court, we, UTC, challenge standing based on some public statements that GE had made. In particular, in September of 2014, GE's Chief Technology Officer said, quote, they had considered the gear and very consciously decided not to take that approach. And this was building on years earlier, they had said the gear was a bad idea. And so, based on those public statements, it looked like GE had decided they weren't going to be in this space, and so we challenged standing. And at that point, their burden was clear, and the court's standard, based on the Figenics case, there's three avenues you can pursue, the substantial risk of infringement, whether they're an actual or prospective licensee, and the third category, whether they have taken action that implicates the claims here, Claims 7 through 11 of the 605 patent. And it- Why does it have to go so far as they have taken specific actions? Why can't economic harm resulting from the existence of the patent and making them increase their R&D costs in other avenues to get around these patents be sufficient for Article III standing? If they pursue the economic loss theory, a few points, Your Honor. First, in their instance, based on the facts in this record, there isn't a controversy of sufficient immediacy and reality as the court- I was kind of, I wasn't really going for a factual answer. I was asking, because we, in our earlier cases, have looked at different theories, and it seems to me that, particularly when we're looking at risk of infringement, that's one thing, but that can't be the only avenue. I mean, that to me sounds like the same standard for declaratory judgment, and it seems like Article III standing here, I may be wrong. My colleagues may disagree, but should be not have to rise to the level of a declaratory judgment standard. So those cases don't help me as much as, if there's economic injury, and economic injury in the terms of what your friend described, what's described in paragraph 15 of his declaration, why isn't that enough? First, that economic injury needs to be tied to some type of action they've taken that implicates- Well, it is. This paragraph said it's impeded their ability to consider a geared turbofan engine. But that's no different than what any company, if you have a competitive industry, you have company A, you have company B. As we sit here today, companies are constantly evaluating another company's patent portfolio, and certainly there are going to be instances where company A thinks company B has an overly broad patent, and says, geez, I might have to design around this. Peter- Exactly, why isn't that enough? Because this is not like Figenics, this is not like Consumer Watchdog. These are two specific competitors in a very specific business, dealing with each other in their patent portfolios. Why isn't that enough? When they say, look, they've got this invalid patent out there, we're going to go challenge it. And when they get an adverse decision, why can't they appeal and say, look, this is harming our potential business? Because this case is Figenics, with the sole distinction being, we are competitors. I think that Figenics is not helpful at all. It is essentially a troll. GE is not a troll. We can take JTAC then. JTAC, they were competitors. And so JTAC really looked at whether they were developing products that would infringe. That's not the theory here. But if we stick with JTAC at least, the competitive point, which is how they're distinguishing- I get you. JTAC is a very hard case for GE. But let's assume I read JTAC as only talking about the theory of potential infringement. And there's still this other potential harm, economic harm, because their R&D is narrowed and the costs are increasing and the like. Is that just, in your view, not a legally sufficient basis to show Article III standing? They have to do more. And the court standard, I mean, the third prong here, they've taken concrete action that somehow implicates the claims. And so they're sitting back, and we focused on paragraphs 15 and 16 of their Chief of Intellectual Properties Declaration. I'm not sure I understand whether you agreed that that was a legally sufficient article and are now just arguing a lack of facts or that you just think that's not legally sufficient. That's not, it's standing alone based on the facts. So if somebody comes in with an undisputed statement from the company and says, our R&D costs are being increased because of this invalid patent that we can't, that we have to design around, even though they specifically said our costs are increasing because of this, in your view, that's not sufficient for legal standing? Standing alone, just based on that hypothetical, no. It's not enough. There needs to be more. It needs to move in a direction where you have a controversy of sufficient immediacy in reality. And what would that be? It's going to be highly fact-specific, but the court's... Well, if they had said, if Mr. Long had said, we have had conversations with potential customers in which the issue has arisen whether we should have a geared turbofan engine. And we have, partly because of the worry about this patent, steered away from that. That seems concrete enough. I don't think then we're at a line to create Article 3 standing. If we just take simple conversations between air framers and jet engine manufacturers, those happen every day. And so it's not just going to be the 605 patent. Conversations about the technology claimed and a reaction within GE to continuing that conversation that's partly dependent on worries about infringement. I don't... There is, in fact, nothing said in paragraph 15 at that level of specificity, but maybe the quite general assertion about economic harm is a generalization of that idea, which, if it were specific enough, feels like it ought to be enough. But in paragraph six of the declaration that's before the court, we saw, and you asked Mr. Ferguson about, there's a long development time here, at least eight to 10 years. And so we're at the point of conversations with air framers. We haven't even, at that point, started that eight to 10 years, because you're just having conversations whether a particular engine's going to work on a certain platform. That happens even before that eight to 10 year clock even starts. And so if we just stick with conversations, boy, we're still eight to 10 years for design, testing, certification with the FAA. So at what point... Excuse me, sir. It seems like it would be very difficult to find standing then in any case involving an industry in which there is a significant lead time for production. That's why I went back to... It's going to be highly fact specific. And their burden here was at least to demonstrate, if there were economic harm, to tie that to these claims at issue and put something concrete and substantial before the court to say, we've made a decision. We're going to develop this particular engine. Indeed, in JTAC, they... That can't be the standard. There's language from Supreme Court cases that say, you don't have to start investing money and put yourself at risk for damage just to get Article III standing. I mean, that's just too far. I just don't understand why if a customer came to them and said, look, we'd like that UTC engine or something like that. Can you design it for us? And they say, we'd like to, but we can't, that that isn't... And I know, I'm not saying that that's what this declaration says, that that's not a sufficient demonstration of economic loss. They're turning away potential business because of a patent. Isn't that Article III standing? No, Your Honor. And in fact, we have many, many patents. GE has many, many patents. That conversation isn't going to be confined to just this 605 patent. There might be many other patents that are implicated. We can't do this. We can't do that. So all of a sudden, in the matter of a conversation, all of a sudden we have Article III standing. But standing isn't a threshold issue. I mean, you still get the merits. I mean, you're not going to lose your patents if they're valid patents. They're not going to lose their patents if they're valid patents. You're two companies competing in a very competitive industry, and every kind of action you take regarding patents and not to choose is going to affect the other one in certain ways. You're correct. I just don't understand how, when there's a clear correlation, and it may be they have not written a sufficient affidavit, there's a clear correlation between business decisions covering patents and R&D goals, that that's not enough for Article III standing. And can you sign me a Supreme Court case that would suggest that that's not enough? I know JTAC helps you a lot. But besides that, I mean, that seems to me to be taking standing doctrine even further than the Supreme Court has. Well, I mean, the Loujain case where it talks about it being the irreducible constitutional minimum, this Article III court requires that injury in fact, requires the concrete and real. And when you're into the conjectural and the hypothetical, which conversations that are taking place every day would be, we're all of a sudden moving that needle significantly. Can I ask you a question about your view about, suppose I thought that the kind of thing said in paragraph 15 here, if it were more specific, might well be enough. But I'm really not sure whether this is some kind of theoretical generality by the lawyer without any actual basis in any actual business decisions of the R&D people. And I thought, I wonder if it would be worth giving GE another opportunity to be more specific. Any thoughts about that? We have the record that they've chosen to submit. This is a bit unique in the sense they control the facts, they control what their plans are. And so they've put the record before the court that is, in their view, sufficient to demonstrate standing to give them another bite at the apple to say something different. I mean, they chose not to offer any declarations from engineers that are actually involved in jet engine development and to go back to them and say, these are the words you need to say. I don't think the court needs to give them that opportunity. So did I hear you correctly to say that lost opportunity cost is sufficient to satisfy a particular life's harm? Did I hear you? No. No. Not... If lost opportunity cost is... Well, in response to your question where you said, well, this is a very fact-specific analysis. Correct? Yes. So do you see a situation where a lost opportunity cost could be sufficient, depending on the facts? Depending on the facts and in particular, if somehow it's tied to concrete plans that are implicating our specific claims at issue, if there's that type of... And it would seem to me that this patent is occupying a space there and they can't design directly to the claims, right? And they have to design around them. That takes lead time. Yes. So the question of whether they would ultimately infringe or not and whether they can design is something that can only be determined by the company if they initiate R&D. That is correct. Okay. So the decision to initiate R&D can be based on the validity of this patent. That's their decision to make, but... That's a lost opportunity cost. But that standing alone, if they make a decision that... Why is it that immediate? The decision to push a button to begin R&D, it seems to me to be just as immediate perhaps as yesterday we had a case involving a Santa Claus outfit. There's no lead time there. The decision to either build your Santa Claus outfit or not, it's immediate. But in this industry, you got significant lead time. Why isn't the decision to push the button, to engage in R&D? Why can't that represent a lost opportunity cost? Because it's standing alone, it's simply an economic harm. We have a valid patent. Well, that's what we're talking about. They have to... Economic harm. An economic harm standing alone just based on... Lost opportunity cost is not economic harm? It is economic harm. Then I don't understand what you've been talking about for the last 15 minutes because we've been asking you hypotheticals about potential customers coming to them and saying, can you develop this? And them saying, we can't, and you saying that that's not enough for standing, even though that's... I think the point of those hypotheticals was to suggest they're foregoing opportunities, i.e. lost opportunity costs, and you keep saying that that's not enough for standing. They need to demonstrate more than simply they have an economic harm that they suffered because they've told a prospective airframer, I can't do this. So even though they demonstrated economic harm in the category of lost opportunity cost, that's not sufficient for Article III standing? No. Okay. Can I ask... I know you're over time, but I want to... And I'm probably overgeneralizing these cases, but there's cases involving competitor cases from the DC circuit, I think, and maybe other circuits, I don't know, where when an agency action increases competition, the target of that agency action has standing. Why isn't this the flip side? The agency action here has decreased competition. Why isn't the person who's suffering from the inability to compete, why shouldn't they have standing? Because going into the patent office proceeding, the 605 patent was a valid patent. They took their challenge, they took their best shot, Claims 7 through 11 were upheld, and so the agency here hasn't made a decision that decreased competition. In fact, the agency upheld certain claims, other claims went away, and so... Why isn't this the flip side of that? When the government protects one competitor against another, that's a government exercise of power that the unprotected, inhibited competitor, if actually about anywhere near to doing something, would be harmed by. But it's then... That's why I'm not sure this changes the fundamental inquiry, how near to doing something involving the patent are they? I think all those competitor standing cases, it was perfectly plain. Somebody was going to come in and there are going to be vastly more competitors in a market that prices were going to go down. I don't remember any of them involving a serious question about the actuality of the normal competitive forces being at work, harming somebody. To me, the central point is, the central question is here, do we really have enough to know that GE is anywhere near suffering an actual harm by this quite general statement in paragraph 15? Well, they haven't made it specific whether they're suffering an actual economic harm in paragraphs 15, 16, the record evidence, but the competition hasn't changed. In other words, the patent here was valid and we are entitled based on that validity to exclude. And when they upheld claims seven through 11 or confirmed the patentability of those claims, there wasn't an increase or decrease in competition. It's not the flip side. Okay. Can I ask you a merits question? I realize- Yes. Yes. That might've been what you were planning to talk about. Why is it not right that the petition, particularly at what, page 203A of the joint appendix, which is almost identical to the attached affidavit from, was it Dr. Abhari, is that his name? Dr. Abhari. Abhari. Seems to refer to a person of ordinary skill in the art being interested in these engines and interested in looking at Willis for purposes that are not limited to the Willis purposes, the short runway engine. And I think it is fair to say, more than fair to say, that the board's decision turns entirely on restricting the field of motivation to skilled artisans interested in serving the had been in Abhari's declaration and the petition would seem to me a fair point, but I'm not sure it is. Tell me why the petition and the declaration have to be viewed as telling a motivation narrative dependent on the Willis purposes. Well, to look at Dr. Abhari's declaration specifically, he talked about the thrust vectoring, which is really a military application. He referred to size, weight, and cost as a possible motivation. But then what he really talked about was the improved axial airflow and airflow leakage in the Dusler reference. And so looking at that, his motivation was the improved airflow. That's why the person of ordinary skill would make this combination. And then in looking at Willis, and when you get specific as to the airflow, it's a unique engine in terms of it has that variable pitch fan where the air comes in the front and goes out the back, but then it has those radio flaps that open quite widely to allow that what was an outlet to become an inlet. So taking his motivation, he looked at the Willis reference, said, it's going to be this airflow leakage. And I think based on the record evidence, he's just simply wrong. Our expert offered substantial evidence of Dr. Abhari not considering the reverse thrust characteristics of Willis, got it wrong. Okay. Okay, thank you. Mr. Ferguson, hold on, I'll restore you back to four minutes. Thank you very much, Your Honor. With respect to the standing issue, Mr. Villei's statement that economic injury is not enough is just directly contrary to what the Supreme Court said in Clinton versus New York. If you had an additional opportunity for Mr. Long or somebody else at GE to get more specific about the possibility of customers having inquired about or had discussions about these geared turbofan structures, would you know? Can you say, and the answer may be you can't say at this point, would you have anything more to say? I can't sit here today and say I know one way or the other, but if the court gave us that opportunity, we would try to address it. And if we can't, we obviously would not make something up. With respect to, as Your Honor, Judge Reyna said, this is a lost opportunity cost for GE. Paragraph 16, Mr. Long declares the existence of UTC's overly broad patents, including the 605 patent, restricts GE's design choices for new engines and it forces GE to expend additional research and development money. That is economic loss. That fits into the Supreme Court's decisions in Monsanto and it fits into this Court's decision in biotechnology industries. The other point I wanted to make on standing is one that relates to the Supreme Court's decision in oil states where they declared that patents are public rights. This decision came out after briefing was complete in this case, but we think it is significant because standing in the context of an issue involving public rights requires that the appellant have a personal stake in the matter as distinguished from a general member of the public. And that's to ensure that the matter is presented in an adversarial context. The Supreme Court said that in the Flost v. Cohen case, 392 U.S. 83. And GE clearly meets that standard here. GE is not simply... Right, but that's not the only standard. It is not. You have to distinguish yourself from the great mass of the public, but you also have to have something concrete and actual and non-speculative. So the fact that they easily satisfy one requirement doesn't mean they satisfy the other. And the central question is concreteness and actuality of the harm that you're asserting. It does, and it goes back to what we believe Mr. Long has established with respect to the specific economic and competitive injuries that it suffered as a result of the existence of the 605 patent in the Board's decision. With respect to the issue on the merits and to address Judge Toronto, your point, when we look at Dr. Abari's declaration, he does not focus on the... When we look at it where? Short haul. Sure. For example, at Appendix 2462, here, Dr. Abari's addressing the QC engine against Claim 1. And in, for example, Paragraph 64, he discusses that Willis discloses a turbofan engine, which is a type of gas turbine engines. And that is directly related to what the scope of the 605 patent is. It's not limited to any type of engine that is only going to fly on short runways or for short haul. And then with respect to the motivation to combine, he did provide that in the discussion at Paragraph 77 and 78, which is Appendix 2469 to 2470, where again, he does not focus on the specific ability of the QC engine to land on a short runway, for example. He focuses on the advantages that a person of oriented skill in the art would have understood the Duesler V-fan provided over the clamshell flaps of the Willis design. And I see I'm running out of time. Okay, Counselor. Thank you very much for your arguments. Thank you, Your Honor.